Anthony M. **AMATO** and A. **Michael Scott, Sr., Plaintiffs,**

v.

**CITY OF RICHMOND, W.R. Shuman, Detective, Individually and as a police officer for the City of Richmond, Robert Hosick, Detective Sergeant, Individually and as a police officer for the City of Richmond, Teresa P. Gooch, Captain, Individually and as a police officer for**

the City of Richmond, Laurel Miller, Major, Individually and as a police officer for the City of Richmond, Philip Mangano, Detective Sergeant, Individually and as a police officer for the City of Richmond, Marty M. Tapscott, Chief, Individually and as police chief for the City of Richmond, Defendants.

Civ. A. No. 3:94cv193.

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 15, 1994.

See also, 157 F.R.D. 26.

Kenneth F. Hardt, Michael J. Kelly, Hardt & Kelly, P.C., Richmond, VA, for plaintiffs.

William J. Hoppe, City of Richmond, Sr. Asst. City Atty., William G. Broaddus, Kenneth D. Crowder, Scott S. Oostdyk, McGuire, Woods, Battle & Boothe, Richmond, VA, for City of Richmond, Robert Hosick, Teresa P. Gooch, Laurel Miller, Philip Mangano and Marty M. Tapscott.

Michael Huyoung, Sarah Jane Chittom, Shuford, Rubin & Gibney, William J. Hoppe, City of Richmond, Sr. Asst. City Atty., William G. Broaddus, Kenneth D. Crowder, Scott S. Oostdyk, McGuire, Woods, Battle & Boothe, Richmond, VA, for W.R. Shuman.

## MEMORANDUM OPINION

PAYNE, District Judge.

Anthony M. Amato, a professional informant, and A. Michael Scott, a police officer employed by the Richmond Police Department, each instituted actions against the

City, its Chief of Police and several police officers. The Chief of Police and the officers are named in their individual and official capacities. The actions were consolidated for discovery and trial because they involve some common issues of fact and law.

In Count I of their respective complaints, Scott and Amato seek recovery, under 42 U.S.C. § 1983, against Major Miller, Captain Gooch, and Detective Sergeants Hosick and Mangano for alleged violations of the Fourth Amendment. These claims arise out of an allegedly nonconsensual entry into the residence which Scott and Amato shared. The stated purpose of the entry was to arrest Amato pursuant to a warrant on a misdemeanor trespass charge. Amato also claims that certain of his property was seized during this search and he seeks damages on account of the allegedly unlawful seizure of that property as well as the allegedly unlawful search.

Count II of Scott's complaint and Count III of Amato's complaint assert precisely the same claims against the same four defendants as asserted in Count I, except that these are asserted as violations of state law, Va.Code Ann. § 19.2–59.

Count II of Amato's complaint asserts a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment as the consequence of his voluntary surrender to arrest on charges of trespass and extortion. Amato names Miller, Gooch, Hosick and Shuman as defendants in Count II.[1]

Count III of Scott's complaint and Count IV of Amato's complaint assert state tort claims for intentional infliction of emotional distress. Miller, Gooch, Hosick, Shuman, Chief of Police Tapscott and the City are named as defendants in these counts.

Following full discovery, all defendants moved for summary judgment on all claims. The parties have briefed and argued their positions.

The facts that spawned these actions are largely in dispute. For purposes of summary judgment, plaintiffs are entitled to have the factual disputes resolved in their favor and to the benefit of the inferences which permissibly may be drawn from the facts. Factual recitations in this opinion are faithful to this charge, but the record reflects that the defendants vigorously deny most of the factual assertions on which the plaintiffs base their claims.

Each claim generally is predicated on a discrete set of facts and the facts will be set forth in detail in the discussion of the claims to which they are most pertinent. However, those discussions and the particularized facts are best understood if viewed against the general background which follows.

## GENERAL BACKGROUND

Amato and Scott met several years ago when Amato was working as an undercover operative for the Federal Bureau of Investigation in its investigation respecting gambling and narcotics in the Richmond area. Scott served as a member of the federal-state task force which conducted those investigations. When the investigations were concluded in 1988, Amato moved away from Richmond and continued his employment as an undercover operative for various federal agencies. In December 1991, Amato, who was between assignments, returned to Richmond and renewed his association with Scott. Shortly thereafter, Amato and Scott entered into an agreement pursuant to which Amato rented a bedroom in, and access to the common areas of, Scott's residence in Chesterfield County.[2]

For some time, a partnership in which Scott was a general partner owned a building in Richmond which in 1991 was leased to Kenneth Acola, who operated Acola's Restaurant on the premises. In January 1992, Acola was delinquent in the rental payments due under the lease and Scott asked Amato to

---

1. The thrust of Count II as originally pleaded was a deprivation of due process under the Fourteenth Amendment, but Amato has abandoned that claim in view of the decision in *Albright v. Oliver*, — U.S. —, — – —, 114 S.Ct. 807, 813–14, 127 L.Ed.2d 114 (1994).

2. The record does not contain a written lease agreement nor does it otherwise reflect the terms of the alleged lease. The defendants, however, do not contest that Amato rented living space in Scott's home.

assist the partnership's lawyer, W. Todd Benson, in collecting the delinquent rent and securing possession of the premises. At the time, Amato was using the alias "Dan Salerno" and his true identity was not widely known.

On January 21, 1992, Amato and Fred Bilter, a retired Richmond firefighter whose help Scott enlisted, went to Acola's Restaurant to serve Acola with an eviction letter authored by Benson and to change the locks (the "Lock Changing Incident"). They served the letter and Amato changed the locks. Acola "became upset and called the police." Several police officers arrived, led by Gordon Overstreet, who instructed Acola to calm down and directed Amato to replace the locks. When this was accomplished, Overstreet reportedly asked Acola either if he had been threatened or whether everything was satisfactory, or both. Acola reportedly responded that he had not been threatened or that he was satisfied, or both. However, Acola expressed concern that the police would favor their follow officer, Scott, in any ensuing disputes or proceedings respecting possession of, or access to, the premises.

In March 1992, Scott became apprehensive that Acola might carry out a previous threat to damage the leased premises and again enlisted Amato to help Benson attend to the matter. In furtherance of that assignment, on March 22, 1992, Amato and Benson, having first requested the Richmond Police Department to have an officer meet them at Acola's Restaurant, visited the premises to determine whether Acola was fulfilling the threat (the "Forced Entry Incident"). When Officer Timothy Arthur met Amato and Benson at the restaurant, they discovered that the locks had been changed. Amato forced open an upstairs door. All three men entered the premises and discovered that the premises had been damaged. Using wood taken from elsewhere on the premises, Amato secured the door through which he had forcibly entered.

Acola subsequently filed a complaint against Amato and Benson for burglary and breaking and entering. He also filed with the Richmond Police Department a complaint alleging that Scott had improperly used his police powers.

The complaint against Scott was referred for investigation to the Internal Affairs Department. Detective Charles R. Sipple headed the Internal Affairs investigation of Scott.

Investigation of the burglary and breaking and entering complaint originally was assigned to two officers in Scott's unit. However, Miller became concerned that this could create the appearance of departmental favoritism towards Scott which, because of Acola's complaint against Scott, Miller wanted to avoid. Accordingly, Miller directed Gooch to reassign the investigation of the Forced Entry Incident to an officer who was not in Scott's unit. Gooch assigned the job to Hosick on March 31, 1992. The details of Hosick's investigation are described more particularly in section III below. So too are the circumstances under which Acola obtained on April 10, 1992 a warrant for the arrest of Amato on a charge of trespass as a result of the Forced Entry Incident on March 22, 1992.

On April 16, 1992, Scott and other officers were detailed by Miller to serve the arrest warrant on Amato at the residence occupied jointly by Amato and Scott. Under circumstances set forth in section I below, the officers entered the residence to arrest Amato.

On April 22, 1992 at approximately 3:15 a.m., Acola's Restaurant was destroyed by a fire set by an arsonist. The investigation of that offense was assigned to Detective Shuman, the fire investigation unit officer on duty when the fire occurred. During that investigation, Shuman reviewed the events that had taken place at the restaurant in January and March 1992 and arrived at the conclusion that Amato had threatened Acola. Shuman communicated this information to William J. Parcell, III, Assistant Commonwealth's Attorney for the City who, through testimony by Shuman, presented a charge of extortion against Amato to the grand jury which, on July 1, 1992, returned an indictment against Amato.

On August 6, 1992, Amato surrendered to arrest on both the extortion charge and the trespass charge. He was detained for ap-

proximately ten hours and then released on a $10,000 bond on the extortion charge. The extortion charge was subsequently dismissed upon entry of a nolle prosequi.

The foregoing events and Scott's reassignment from the detective division to street patrol in April, 1992 lie at the core of the claims asserted by Amato and Scott. The alleged motivations for these acts also are central to the plaintiffs' theory of their case. Here too, the charges are highly disputed. In sum, it is the plaintiffs' theory that the search and the arrest of Amato were undertaken for the purpose of exerting emotional pressure on Amato and Scott to force them to disclose whether they were involved with federal authorities in investigating police corruption in the City and to establish physical control over Amato to determine his true identity.

Plaintiffs point to a number of incidents which, they say, evince improper motivation for the constitutional deprivations they allege. Specifically, on April 9, Hosick is alleged to have asked Scott whether he and Amato were investigating City police officers. On August 6, when Amato surrendered, Hosick is alleged to have asked Amato whether he was working for the FBI or the IRS and to have told Amato that "this whole mess will be over in a day or two" if Amato disclosed the agency for which he was working. Amato also alleges that Hosick said: "Tony, [Amato] we know you didn't do anything wrong but we need to get Mike [Scott] and know you have the goods on him. Help us and we'll get you out of this mess."

Plaintiffs also rely on remarks in a report prepared by Shuman for the Commonwealth's Attorney: "I would like to get a warrant for Salerno [Amato] on another matter that is a felony and I also have other things that I will not put in a letter that will help my first case and may, indeed, prove the arson case." Also, several months after the issuance of the trespass warrant in April and the return of indictment for extortion in July, Shuman is alleged to have said: "Well, I'm going to get him [an alleged reference to Amato] any way," and "I got it cleared. They're dirty." Finally, in 1994, after this action was filed, Shuman is said to have stated that Scott was a "lousy no good criminal;" that Amato and Scott were "scumbags" and that he would "burn their asses."

Finally, plaintiffs find significant certain subjective impressions of Detective Sipple who was in charge of the Internal Affairs investigation of Acola's complaint against Scott. Sipple testified that he felt, within himself, pressure to find a violation of police procedure by Scott. This impression arises from two incidents. First, before Sipple completed the investigation, he allegedly told Miller that "things looked good for Scott" to which Miller allegedly responded that he thought there were violations and trusted that a proper investigation would disclose them. Also, Sipple was told that Miller expressed to Sipple's boss the view that Sipple was biased and suggested that the investigation be reassigned.

The defendants deny all of these assertions; but, for summary judgment purposes, they must be taken as having been said and plaintiffs are entitled to have the permissible inferences drawn in their favor. Plaintiffs contend that this evidence could be construed as supporting an inference that the search and the arrest of Amato on trespass and extortion charges were prompted by an ulterior motive on the part of Miller, Gooch, Hosick and Shuman, and that the Chief of Police knew of the motive and did not stop the conduct of which plaintiffs complain.

This evidence makes no difference in a Section 1983 action if, for reasons independent of the evidence described above, the plaintiffs have suffered no deprivation of federally bestowed rights. If Scott consented to the search and there was probable cause for the charges against Amato, the plaintiffs have suffered no deprivation and any intent to cause a deprivation would be irrelevant. Likewise, if the challenged conduct did not cause a deprivation, evidence of what motivated the conduct is irrelevant. Nor is ill-will or ulterior motive relevant to the applicability of qualified immunity.

Against this general background, the court turns to a consideration of each claim and, in so doing, will further explicate the factual record on which each claim is based, again

according to the plaintiffs the benefit of all factual disputes and the inferences which may permissibly be drawn from the facts construed in their favor.

## DISCUSSION

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under subsection (e) of Rule 56:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

■ It is the responsibility of the party seeking summary judgment to inform the court of the basis for its motions, and to identify the parts of the record and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Pocahontas Supreme Coal Co. v. Bethlehem Steel,* 828 F.2d 211, 216 (4th Cir.1987). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.'" *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. The moving party may also use affidavits to support its motion. In either event, the nonmoving party must go beyond the pleadings and, by citing its own affidavits or by citing "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* Opposition to a properly documented summary judgment motion may not be based solely on the pleadings.

■ The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis added). It is the function of the district court not to weigh the evidence, but to determine whether there is a genuine issue for trial and "there is no issue for trial unless *there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.*" *Id.* at 249, 106 S.Ct. at 2510 (citations omitted) (emphasis added). Hence, summary judgment is appropriate if the "evidence is merely colorable" or "is not significantly probative." *Id.* at pp. 249–50, 106 S.Ct. at 2510–11 (citations omitted). The standard for summary judgment mirrors the standard for judgment as a matter of law under Fed.R.Civ.P. 50(a), the principal difference being procedural. *Id.* at 251, 106 S.Ct. at 2511. And, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party, however, "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 257, 106 S.Ct. at 2514. The district court also "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

■ Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513; *McKinney v. Board of Trustees of Mayland Community College,* 955 F.2d 924, 928 (4th Cir.1992). Summary judgment is appropriate only if, upon consideration of the record as a whole,

a reasonable trier of fact could not find for the non-movant. *Allstate Fin. Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). However, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (citations omitted); *see also, Guinness PLC v. Ward,* 955 F.2d 875, 883 (4th Cir. 1992).

■ Although the defendants seek summary judgment on the ground that they deprived the plaintiffs of no constitutional right, all but the City also have asserted a qualified immunity defense to all federal claims.[3] That defense is available if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). *Harlow's* focus on objective reasonableness was expressly driven by a desire to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

The court may determine on a motion for summary judgment "not only the currently applicable law, but also whether that law was clearly established at the time an action occurred." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Whether the law was clearly established turns on whether the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

These principles control resolution of the motions for summary judgment.

# I

## The Search And Seizure Federal Claims

### A. Amato's Claim For Seizure Of Property

■ Count I of Amato's complaint seeks damages for an allegedly illegal search and seizure. The seizure allegedly occurred during the April 16 search of the residence. The only evidence offered to prove the seizure is Amato's testimony that several items were missing from his bedroom when he returned to the residence four months later. The only evidence to link any defendant with an allegedly missing item is an allegation that the police department learned of a code name used by Amato, a name allegedly appearing on a fax cover sheet seized during the search.

Scott testified at deposition that none of the officers who participated in the search left the residence in possession of any items from the premises. Amato, however, describes the totality of items allegedly seized as too large to be concealed on the person of the officers. Amato's claim of unlawful seizure cannot survive in light of this evidence. Thus, Amato's Count I assumes the same dimensions as Count I of Scott's complaint: an allegedly unlawful search of the residence on April 16, 1992.

### B. The Unlawful Search Claims

Section 1983, which imposes civil liability on any person who, under color of law, deprives another of federal constitutional rights, or statutory rights, " 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Albright v. Oliver,* — U.S. ——, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2695, n. 3, 61 L.Ed.2d 433 (1979)). Therefore, "[t]he first step in any such claim is to identify the specific constitutional right alleg-

---

**3.** The City is not named as a defendant in the federal claims. Also, the City is not entitled to the protection of qualified immunity.

edly infringed." *Albright*, — U.S. at —, 114 S.Ct. at 811. The federal right on which Scott and Amato base the Section 1983 claim in Count I is the Fourth Amendment's guarantee of freedom from unreasonable searches.

To succeed on Count I, Amato and Scott must prove by a preponderance of the evidence that: (1) Miller, Gooch, Hosick or Mangano engaged in conduct which deprived plaintiffs of a federal Constitutional right by subjecting them to an unreasonable search of their dwelling; (2) those defendants were acting under color of Virginia law; and (3) the acts of those defendants proximately caused the damages plaintiffs claimed to have sustained. 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions* § 103.03. *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *McDonald v. Dunning*, 760 F.Supp. 1156 (E.D.Va.1991).

It is not disputed that entry of the residence was taken under color of state law. The necessary inquiry is whether the search was lawful. To establish an unlawful search, Amato and Scott must prove that the search on April 16 was not authorized by a warrant, by exigent circumstances or by consent. *Steagald v. United States*, 451 U.S. 204, 216, 101 S.Ct. 1642, 1649, 68 L.Ed.2d 38 (1981); 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions,* § 103.02. There is no claim of exigency and there was no search warrant.

■ Warrantless searches are presumptively unreasonable. *See Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). However, voluntary consent is a universally recognized exception to this presumption. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Although the defendants concede that the search was warrantless, they contend that it was constitutionally valid because it was based on Scott's voluntary consent.

■ Consent is permission to enter a premises communicated by someone who objectively manifests authority to give permission to enter. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). For consent to justify a warrantless search, the consenting party must "freely and intelligently [give his] unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." *United States v. Morrow*, 731 F.2d 233, 236 (4th Cir.) *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984) (citing *United States v. Vickers*, 387 F.2d 703, 706 (4th Cir.1967), *cert. denied*, 392 U.S. 912, 88 S.Ct. 2069, 20 L.Ed.2d 1369 (1968)).

### 1. *The Burden Of Proof*

■ In a section 1983 civil action, the burden of proving involuntary consent rests on the plaintiffs. *Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2nd Cir.1991) (As to consent in 1983 action, the "ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials"); *Crowder v. Sinyard*, 884 F.2d 804, 824–26 (5th Cir.1989), *cert. denied*, 496 U.S. 924, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990) (burden of proof does not shift and plaintiff must prove that state officials conducted not only a warrantless search but a warrantless search without authorization under an exception to the warrant requirement);[4] Isidore Silver, Police Civil Liability § 8.06[5][d][i][B] (1994) ("[a]lthough a warrantless search is presumptively unreasonable, this presumption does not create a *prima facie* civil cause of action and the burden of proof always remains with plaintiff"); *see also Larez v. Holcomb*, 16 F.3d 1513, 1517 (9th Cir.1994) (in a section 1983 action charging illegal seizure of a person, plaintiff "at all times had the ultimate burden of proving to the jury that she had been seized unreasonably in violation of the Fourth Amendment"). The reasoning of the Second, Fifth and Ninth Circuits is persuasive that the burden of proving involuntary

---

**4.** The Supreme Court's decision in *Horton v. California*, 496 U.S. 128, 130, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990) abrogated *Crowder* insofar as *Crowder* limited the plain view doctrine to inadvertent discoveries. *Horton* does not affect those parts of *Crowder's* holding cited herein.

**1134**

consent in a civil action, under Section 1983, is allocated to the plaintiffs.

Citing authority from criminal cases, Scott and Amato contend that the burden of proving voluntariness of consent rests on the defendants. Those authorities do not control in a civil action because the issue of consent arises in a fundamentally different context in a civil action. Specifically, in a criminal case the government has the burden of proving its case beyond a reasonable doubt. Consequently, if the government seeks to use evidence obtained through an allegedly consensual search, the government necessarily bears the burden of proving voluntary consent because that is part of the burden allocated to it. In the civil context, however, the plaintiff has the burden to prove all elements of the claim. One of those elements in a Section 1983 action is that the action violated a federal right. This burden is not fulfilled by simply asserting that a search occurred, or even that a warrantless search occurred, because such a search could be within the law. *See Crowder,* 884 F.2d at 824–26.

The fact that warrantless searches are presumptively unreasonable operates in a civil case only to shift the burden of production on the issue of voluntary consent, not the burden of persuasion. *Ruggiero,* 928 F.2d at 563. Therefore, once a plaintiff establishes a warrantless search, a defendant must offer evidence that the search was lawful, notwithstanding the absence of a warrant. This can be done by offering evidence of consent which is an exception to the warrant requirement. However, this does not alter the fundamental principle that a civil plaintiff bears the ultimate risk of nonpersuasion on an element of his case. *Id.*

In this case, the defendants have presented sworn testimony that Scott was trained in the law of the Fourth Amendment, that he opened the door with his own key, and that no threats were made or coercive action taken to secure his consent. This fulfills the defendants' burden of production on the issue of voluntary consent. It therefore falls upon Scott and Amato to bear the ultimate burden of persuasion that Scott's actions did not constitute voluntary consent. Accordingly, under *Anderson v. Liberty Lobby,* 477

U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the evaluation of the record on consent, for purposes of summary judgment, must be guided by the fact that the plaintiffs bear the burden of proof.

At least two cases have held that the defendant bears the burden of proving consent in a Section 1983 action. *Tarter v. Raybuck,* 742 F.2d 977, 980–81 (6th Cir.1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985); *Huotari v. Vanderport,* 380 F.Supp. 645, 648 (D.Minn.1974). However, the court finds these cases less persuasive than those decided by the Second, Fifth and Ninth Circuits.

In *Tarter,* the Sixth Circuit held that the burden is on the defendants to prove that the plaintiff voluntarily waived his constitutional rights by consenting to a search, because there is a presumption against the waiver of rights. *Tarter* is unpersuasive for two reasons. First, the Fourth Circuit does not determine consent in terms of waiver of rights and the presumption against waiver. Instead, it looks at the totality of the circumstances. *United States v. Poole,* 718 F.2d 671, 674 (4th Cir.1983). Second, the better response to the fact that warrantless searches are presumptively unreasonable is to require the defendant to produce evidence of voluntary consent, leaving with the plaintiff the ultimate burden of non-persuasion. To hold otherwise would alter the fundamental burden of proof in a civil case and would allow civil plaintiffs to prevail by simply *pleading,* rather than *proving,* that the search violated his rights.

In *Huotari,* a Minnesota district court held that "defendants' reliance on the defense of consent to validate the search places upon them the burden of proving that consent was, in fact, freely and voluntarily given." *Huotari,* 380 F.Supp. at 648. The court does not give the basis for this assertion, and for the reasons stated respecting *Tarter* the court finds *Huotari* unpersuasive.

### 2. *Voluntariness*

■ In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854

(1973), the Supreme Court articulated the test for voluntary consent holding that:

> [W]hen the subject of a search is not in custody and the state attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that the consent was *in fact voluntarily given, and not the result of duress or coercion, express or implied.*

*Id.* at 248, 93 S.Ct. at 2058 (emphasis added). *Schneckloth* also explained that "the question whether consent to a search was in fact 'voluntary' or was the product of duress or coercion, express of implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2047. This test is subjective to the extent that it turns on whether the consenting individual actually gave his consent freely and voluntarily. *See United States v. Wilson,* 895 F.2d 168, 171–72 (4th Cir.1990) (holding that "the determination of consent is subjective" and " 'determined by the totality of all the circumstances' ") (citations omitted).

Relying on the Supreme Court's decision in *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), the defendants contend that the an objective standard governs the determination of voluntary consent. In *Jimeno,* the Supreme Court held that "[t]he standard for measuring *the scope* of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id.* at 249, 111 S.Ct. at 1802 (emphasis added).

The scope of consent and the voluntariness of consent are two distinct issues. Under *Schneckloth,* whether consent was "in fact voluntary," based on the totality of all of the circumstances, does not turn solely on objective manifestations. *Jimeno* does not hold otherwise.

Defendants also rely on *United States v. Mendenhall,* 446 U.S. 544, 559, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) to support their view that consent is to be measured against an objective standard. However, *Mendenhall* involved whether a *withdrawal* of consent had been communicated. This, like the scope of consent, is an issue distinct from whether the consent was voluntarily given in the first instance.

Finally, defendants point to *United States v. Smith,* 30 F.3d 568 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 604, 130 L.Ed.2d 514 (1994) as support for an objective test. *Smith* does not help the defendants' cause. In *Smith,* the Fourth Circuit was confronted by a defendant's claim that his consent, or failure to refuse permission to search, was the nonconsenual product of two previous encounters with police in other jurisdictions in which he had been assaulted. The Court of Appeals rejected Smith's argument because the encounters were temporally unrelated to the search to which he consented. *Id.* at 571. Nothing in *Smith* alters the clear statement in *Wilson* that "the determination of consent to search is subjective." *United States v. Wilson,* 895 F.2d at 171.[5]

■■■ The issue before the court on this motion for summary judgment, therefore, is whether the evidence could permit reasonable jurors to conclude that the entry into Scott's house was made without Scott's voluntarily given consent. The facts that plaintiffs contend are pertinent to this issue, taken as true and allowing all permissible inferences therefrom, are that:

(1) Under circumstances indicating some urgency, Scott was instructed by Gooch to abandon preparation of a search warrant and to report to Miller's office.
(2) Scott complied and, about twenty minutes after arriving at Miller's office, met with Miller, Gooch and Hosick. During

---

**5.** It must be noted, however, that *Smith* does provide significant guidance for the application of the subjective, totality of the circumstances test of coercion. This guidance is that the test is not *purely* subjective, because an individual's sentiment that he had no choice other than to consent does not constitute coercion if this sentiment is not based upon the circumstances of the search transaction. This also guides the court's application of the totality of the circumstances test. Smith's prior encounters with the police were not part of the circumstances to be considered. Therefore, the Fourth Circuit limits the "totality of all of the circumstances" to those circumstances that are a part of the search transaction.

that meeting Miller inquired whether Scott was aware that a warrant had been issued for the arrest of Amato on trespass charges arising out of the March 22, 1992 incident at Acola's restaurant.

(3) Scott responded that Hosick previously had informed him of the warrant and advised Miller that Amato intended to surrender upon return to Richmond at an unspecified date.

(4) Miller, in "a shrill and menacing tone," then said: "I am ordering you to go to your house and arrest your roommate right now." Scott replied that Amato was out of town and that Scott did not possess the power to effect an arrest in Chesterfield County, the location of the residence he and Amato shared.

(5) Pointing his finger at Scott and using a "vociferous and more menacing tone of voice," Miller said: "I am ordering you to go." Hosick was then instructed by Miller to take another officer on the mission and "not [to] let Scott out of your sight until you search."

(6) Scott, Hosick and Mangano (whom Hosick had enlisted to help on the arrest mission) travelled in the same car and, en route, Scott repeated that Amato was not at the house and "voiced [his] displeasure over being called in from an investigation and ordered by Major Miller and to my place of residence to arrest Amato, who was not even in town."

(7) As Hosick, Mangano and Scott exited the car upon arrival at the residence, Hosick said: "Mike, we've got to look in the house."

(8) Mangano was dispatched to the rear of the house and Hosick and Scott, along with Officer Horowitz from Chesterfield County who was to serve the warrant, walked from the street to the porch, and, en route, Scott informed Horowitz that he "was 'embarrassed' by the situation, but had been ordered by Miller to participate."

(9) When they arrived at the front door, Horowitz knocked but there was no answer and, according to Scott, "... under duress, I opened the door." Undisputed evidence shows that there was no conversation after Horowitz knocked and that Scott opened the door with his key.

(10) Scott, Horowitz and Hosick entered the house through the front door. They were joined later by Mangano who entered through the rear door at the invitation of Hosick. All but Scott looked through the house. Finding that Amato was in fact not there, the others left.

On these facts, the plaintiffs first argue that Scott gave no consent, voluntary or otherwise. (Plaintiffs' Joint Mem., p. 35). Their theory is that Scott permitted entry because he "merely acquiesced to his superior's order that he participate in the search." (Plaintiffs' Joint Mem., pp. 36, 40). The "superior's order" is Hosick's alleged statement: "Mike, we've got to look in the house." (Plaintiffs' Joint Mem., pp. 39–40).

It is unclear what role the plaintiffs ascribe to the comments allegedly made by Miller in his office. On the one hand, the plaintiffs suggest that Miller's comments constituted an order to search issued to Hosick and heard by Scott. (Plaintiffs' Joint Mem., p. 40). On the other hand, the plaintiffs argue that Miller's comments are part of the totality of the circumstances against which the "order" by Hosick is to be evaluated. (Plaintiffs' Joint Mem., p. 40).

Scott's own affidavit clearly establishes that the order Miller gave to Scott was an order to go to his house and arrest Amato, not to search. (Scott Affidavit, ¶¶ 23, 24). In fact, even after Miller allegedly told Hosick "not [to] let Scott out of your sight until you search," (Scott Affidavit, ¶ 25), Scott continued to understand Miller's instructions as "to go to my place of residence *to arrest Amato.*" (Scott Affidavit, ¶ 26) (emphasis added). The plaintiffs offer no other evidence that Miller ordered Hosick to conduct a search. Hence, we need not look beyond Scott's own version of events to conclude that Miller's order was to arrest, not to search.

However, the fact that Miller's alleged

statements[6] do not constitute an order to search does not make them irrelevant. Because Miller's remarks were made only shortly before the search and allegedly mentioned a "search," they are part of the totality of the circumstances to be considered in assessing whether Scott's consent was coerced. So too is it relevant that: (i) Miller's own affidavit states that he "concluded that Scott should participate in the arrest because it was his house, and he could provide access, if necessary," (Miller Affidavit, ¶ 7); (ii) Scott's protests against participating in the arrest were rebuffed; (iii) Hosick slightly outranked Scott; and (iv) Scott understood Hosick's alleged statement to be a directive rather than a request.

However, for summary judgment purposes, the totality of the circumstances also include those undisputed facts that cut against the plaintiffs' claims. First, Scott's protests against participating in the arrest of Amato were that he was busy with other duties and that the trip was futile because Amato was out of town. It was, of course, within Miller's province, as Scott's superior, to decide how Scott was to use his time while on duty and to reject Scott's assertion that Amato was out of town. Considering Scott's close relationship to Amato and Acola's complaint of favoritism, it was neither unreasonable nor nefarious for Miller to have rejected Scott's protestations. In any event, Miller's responses do not establish coercion to permit a search, much less a threat of retribution.

 Second, Scott advised Miller that he was without the power of arrest in Chesterfield County. Miller responded to Scott's concern that he lacked authority to arrest in Chesterfield by arranging for the assistance of a Chesterfield County officer who did possess such powers, thereby evincing responsiveness to that concern.

Third, Scott was knowledgeable in the law of search and seizure and knew that a warrantless search without consent was invalid. Likewise, Scott knew that a property owner could decline to give consent and he is charged with knowledge that he could not be disciplined for exercising his constitutional right to refuse entry even if Hosick had ordered it.[7] It is therefore particularly significant that Scott did not advance a constitutional right as a ground for objection to participation in the arrest of Amato, whatever Scott thought that might entail.

Fourth, the circumstances immediately preceding and following the entry are part of the totality of the circumstances. According to Scott's own account, he made no protest after Hosick, upon exiting the car, gave the purported command—"Mike, we've got to look in the house." He raised no objection[8] as the officers walked from the car to the house. When the knock at the door failed to elicit a response, Scott, again with no objection and without suggestion, used his key to open the door. He made no protest during the time the other officers searched the house for Amato or during the return trip to headquarters. While one is not required to protest an unreasonable search to preserve his constitutional rights, the fact that Scott responded to Hosick's statement by opening the house without a protest or further "pressure" is part of the totality of the circumstances in which voluntary consent is measured.

Fifth, shortly after returning to headquarters, Scott complained to his superior, Captain A. Christine Bailor, that he had been victimized by an unlawful search. This, of

---

6. Miller, Gooch and Hosick deny that Miller made any of the remarks attributed to him by Scott.

7. There can be little doubt that a police officer cannot be disciplined for asserting his constitutional rights by refusing to consent to the warrantless search of his home. *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 886 (9th Cir.1990) (holding that there can be "little doubt" that it was improper for the police department to discipline an officer for refusing to allow a search of his garage); *see also Gardner v.*

*Broderick*, 392 U.S. 273, 279, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968) (holding that it was improper to discharge the police officer for refusing to waive constitutional right against self-incrimination).

8. Scott states that, as they approached the house, he told Horowitz (the Chesterfield County officer) that he was embarrassed by the participation. That, however, is hardly an objection to the participation and it is not the assertion of a right.

course, confirms that, at the time of the event, Scott knew the parameters of the law and his rights and that he knew how to articulate those rights when he elected to do so.

It is against these total circumstances that Scott's claim of coercion must be measured. The legal predicate for the contention of coercion is a line of authority addressing searches found to be the product of a police command. Specifically, plaintiffs assert that under *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and its progeny, compliance with a police command is not consent. Those cases, say the plaintiffs, control the outcome of the consent issue here.

In *Bumper,* four police officers went to the home of a 66 year old woman, and when she met them at the door one officer announced "I have a search warrant to search your house." *Id.* at 546, 88 S.Ct. at 1790. The woman responded "go ahead" and opened the door. *Id.* At a suppression hearing, the prosecutor did not rely on the validity of the warrant, contending instead that the woman had consented to the search.

The Supreme Court held that a search cannot "be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant." *Id.* at 548, 88 S.Ct. at 1791. This was because consent is not proven by showing "no more than acquiescence to a claim of lawful authority." *Id.* at 549, 88 S.Ct. at 1792. "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—all be it colorably lawful coercion. Where there is coercion there cannot be consent." *Id.* at 550, 88 S.Ct. at 1792.

The plaintiffs also rely upon *United States v. Shepherd,* 714 F.2d 316 (4th Cir.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1914, 80 L.Ed.2d 462 (1984) which involved the search of the trunk of a car pursuant to a state

investigation of illegal liquor production. After observing a suspect transport several one-gallon plastic jugs from the trunk of his car to a wooded area, an officer approached the suspect and asked him for the key to the trunk. The suspect complied and the officer opened the trunk to discover 38 one-gallon plastic jugs which were later opened without a warrant and found to contain homemade liquor.

The Fourth Circuit decided the validity of this search under the automobile exception, but in a footnote made the observation that: "there is no evidence that Shepherd's consent was obtained. The officer asked for Shepherd's key, not for permission to search the trunk." *Id.* at 318, n. 2.[9] Both officers at the scene testified that consent was not obtained. *Id.* The court further stated:

> Moreover, obeying a polite request issued by someone obviously in authority and capable of enforcing the request does not amount to 'consent' to the request. Citizens may obey police commands even those put in the form of police requests (e.g. "Please raise you hands above your head;" "Please give me your keys") without any derivation from such non-volitional acts of a conclusion that they have waived their constitutional rights.

*Id.*

Finally, the plaintiffs' take comfort in *United States v. Winsor,* 846 F.2d 1569 (9th Cir.1988), wherein the Ninth Circuit considered a search in which the police knocked on the door, identified themselves as police, and demanded that the occupants open the door. On these facts, the Ninth Circuit held that, as a matter of law, the opening of the door was not consent. *Id.* at 1573, n. 3.

On the strength of these "police command" cases, plaintiffs argue that, on the totality of the circumstances, a reasonable jury could conclude that "[i]n light of the fact that Scott's prior protest to Maj. Miller had been ignored, Scott reasonably concluded that any further protest to Sgt. Hosick would be meaningless." (Plaintiffs' Joint Mem., p. 40).

---

**9.** This is notably different from the case at bar, in which Hosick referred specifically to *looking* in the house.

These "police command" decisions stand for the principle that a citizen, who is neither informed nor aware of the right to refuse consent, cannot be held to have given consent merely by complying with an instruction or order of a law enforcement official because that compliance is simply an acquiescence to the apparently lawful authority to search. This principle, of course, presupposes that the acquiescing person is not informed of the right to resist a search. Indeed, as explained in *Bumper*, the presence of an asserted authority to search by a law enforcement official is tantamount to an assertion that "the occupant has *no right* to resist the search." *Bumper*, 391 U.S. at 550, 88 S.Ct. at 1792 (emphasis added).

The totality of the circumstances in this action do not provide the predicate for the application of the "police command" rationale because the circumstances establish beyond question that Scott knew fully of the constitutional right to resist if he so desired. Moreover, the record fails to establish a threat or compulsion of any kind. Although Scott claims now that he feared repercussions if he did not permit entry, there is no evidence to support a reasonable basis for such apprehensions. Allowing entry, with full knowledge of the right not to do so, and absent compulsion, is not *within the reach of* the "police command" cases on which plaintiffs rely. Thus, Scott's conduct in allowing entry was consent, not acquiescence to a command within the meaning of *Bumper* and its progeny.

The question remains then whether the record, construed in plaintiffs' favor, permits a reasonable jury to conclude that Scott's consent was coerced. It does not.

The totality of the circumstances establish that, with full knowledge of his rights and without threat or compulsion, Scott opened the house to his fellow officers. Scott's own testimony is that he construed Miller's order to require participation in an arrest. His own testimony shows that he knew how to register protests about intrusions on his time and the futility of the mission. Although Scott's protests produced a direction from Miller to do what he was told, his comment respecting the power to arrest met with a

reasoned solution. And, at no time did Scott receive a threat.

Finally, Scott's conduct at the house belies coercion. Although he complained to Howoritz about embarrassment after Hosick's statement, he did not exercise his known right to refuse and his actions, taken as a whole, bespoke voluntary conduct. Where, as here, there is no evidence of force or threat, and one knowledgeable of his right to refuse opens his house to entry, a reasonable jury could not conclude that consent to be involuntary.

### 3. *Qualified Immunity*

Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. *Karsten v. Kaiser Found. Health Plan of the Middle Atlantic States, Inc.*, 36 F.3d 8, 11 (4th Cir.1994). However, considering that plaintiffs' reliance on the "police command" cases is made under somewhat unusual facts; that the same facts frame the issues respecting the qualified immunity defense; and that the issue of qualified immunity enjoys a rather unique amenability to appeal, this case presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision.

Defendants assert that, even if this record presented a triable issue of fact as to the voluntariness of Scott's consent, they would be protected by the doctrine of qualified immunity to the extent they are sued in their individual capacities. We now consider that question.

The Supreme Court has determined that law enforcement officials are entitled to a qualified immunity from personal civil liability under 42 U.S.C. § 1983 in large measure because of the complex tasks performed by such officials. *Taylor v. Farmer*, 13 F.3d 117, 120 (4th Cir.1993). Thus, in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

Applying that principle in determining the existence of qualified immunity to a suit alleging Fourth Amendment violations under 42 U.S.C. § 1983, the Supreme Court, in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), held that the immunity from civil liability exists so long as the official's "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 638, 107 S.Ct. at 3038. In that regard, the Court explained that:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039.

Thus, the doctrine of qualified immunity extends to law enforcement officers a margin of error "when they navigate uncharted areas at the margins of constitutional criminal law." *Tarantino v. Baker,* 825 F.2d 772, 774 (4th Cir.1987).[10] This is because "... there are two levels on which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which the right applies to the actions of the official must also be apparent." *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993) Therefore, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.*

▄▄ The availability of qualified immunity is determined against a standard of objective reasonableness. *See Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). As the Fourth Circuit observed in *Taylor v. Farmer,* "[t]he Su-

preme Court's decisions place a special emphasis on the reasonableness of an officer's actions, requiring courts to make an objective inquiry into the facts facing the officer at the time of the alleged improper act." *Taylor v. Farmer,* 13 F.3d at 120.

In that regard, "[t]he existence of qualified immunity 'generally turns on the "objective legal reasonableness" of the actions' [citations omitted] without regard to the knowledge or subjective intent of the particular official." *American Civil Liberties Union of Maryland, Inc. v. Wicomico County,* 999 F.2d 780, 784 (4th Cir.1993). Recently, in *Rowland v. Perry,* 41 F.3d 167 (4th Cir.1994), the Fourth Circuit explicated the nature of the reasonableness inquiry holding that:

> The reasonableness inquiry is an objective one. *Id.* To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case. *Hunter v. Bryant,* 502 U.S. 224, 226–30, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991).
>
> Though it focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question. *Sevigny v. Dicksey,* 846 F.2d 953, 957 (4th Cir.1988). Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the "actual"

---

10. The Supreme Court's decision in *Horton v. California,* 496 U.S. 128, 130, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990) abrogated *Tarantino* insofar as *Tarantino* limited the plain view

doctrine to inadvertent discoveries. *Horton* does not affect those parts of *Tarantino's* holding cited herein.

facts, and allows them to focus instead on what the police officer reasonably perceived. *Gooden v. Howard County, Md.,* 954 F.2d 960, 965 (4th Cir.1992) (en banc). In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are.

*Id.,* 41 F.3d at 172.

On a motion for summary judgment, the court may determine whether the law was clearly established at the time an action occurred. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Therefore, if the defendant's entitlement to immunity turns on a factual dispute that dispute is resolved by the jury at trial. However, if, assuming the facts alleged by the non-moving party to be true, it is still not clear that the official action violated plaintiffs' rights, summary judgment is appropriate. *See Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039. "[T]he burden of establishing that critical issue that the right violated was clearly established under the stated standard appears to rest on the plaintiff suing the public officer." *Clark v. Link,* 855 F.2d 156, 160–61 (4th Cir.1988). *See also Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3021, 82 L.Ed.2d 139 (1984).

▪ Applying these principles to the facts in this record, the defendants are entitled to qualified immunity for the alleged violation of Scott's and Amato's Fourth Amendment rights to be free from unreasonable searches even if there were a genuine dispute of material fact respecting whether Scott's consent was voluntary. The record establishes that Hosick made the statement "Mike, we've got to look in the house." In response to this statement, an experienced police officer knowledgeable of the law of search and seizure walked to his door, inserted his key into the door, and allowed fellow officers to enter. At no time did Scott articulate objection to entering his house. According to the record, Scott made no negative response after Hosick allegedly said that it would be necessary to look in the house.

Without protest, he accompanied Hosick and Horowitz on the walk from the car to the front door where Horowitz knocked on the door. When there was no answer, Scott, without any prompting from anyone, removed the key from his pocket and used it to open the front door to his house. He neither complained about the opening of the door nor objected to the subsequent entry by Hosick and the others nor in any way suggested that it was objectionable to him.

This conduct must be viewed, as Hosick and Mangano would have viewed it, in stark contrast to Scott's complaints about being ordered to arrest his roommate which he claims vociferously to have made in Hosick's presence during the meeting with Miller and Gooch and in Hosick's presence en route to the house. Clearly, a reasonably objective officer could have believed that another officer who knew how to voice objections to directions of a superior, but who instead opened the door without objection, was voluntarily consenting to the search.[11]

Based on these facts and viewed from the perspective of the actors, the search of the house "could reasonably have been thought consistent with the rights [the officers] are alleged to have violated." *Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038. This result is not altered by the plaintiffs' assertion that "the law of consensual searches is clearly established by *Bumper* and subsequent cases." (Plaintiffs' Joint Mem., p. 44). To the contrary, plaintiffs have cited, and the court has found, no authority applying the "police command" line of authority to a fact pattern which remotely resembles this case. Thus, even if that authority were ultimately determined to control these facts, it could not be said that the violation was apparent in the light of the pre-existing law at the time of the search. Certainly it could not be said that a reasonable officer must have understood that what he was doing violated plaintiffs' rights. Therefore, under *Harlow's* objective reasonableness standard, the defendants are protected by qualified immunity.

---

**11.** While the failure to protest alone is insufficient to constitute voluntary consent, it is directly relevant to the issue of whether a reasonable

officer would have concluded that Scott was voluntarily consenting to the search.

Nor can plaintiffs prevail by making the general argument that it is "clearly established that police may not coerce consent from a homeowner," (Plaintiffs' Joint Mem., p. 42), or that the law is "quite clear as to the factors that determine voluntary consent." (Plaintiffs' Joint Mem., p. 44). In *Anderson,* the Supreme Court expressly recognized that the operation of the "clearly established" standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038. The Court noted that allowing an overly general characterization of the legal rule would allow plaintiffs "to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Therefore, it is not sufficient that the prohibition of coerced consent is clearly established in the law. To overcome qualified immunity, the law must be sufficiently clear that a reasonable officer would have known that *his actions* violated the law. *Id.* at 640, 107 S.Ct. at 3039. For the reasons previously stated, that simply is not the case here.

Finally, plaintiffs contend that the violation of their constitutional rights was motivated by ill-will and the defendants' ulterior motive and that such actions are not protected by qualified immunity. This argument must be rejected in light of the Fourth Circuit's most recent admonition that "[s]ubjective factors involving the officer's motives, intent, or propensities are not relevant" to the determination of qualified immunity. *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994).

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court expressly departed from its previous holdings that qualified or "good faith" immunity had both an objective and subjective aspect when applied to summary judgment motions on federal claims. *See Burnham v. West,* 681 F.Supp. 1169, 1173, n. 8 (E.D.Va.1988). Before *Harlow,* the subjective aspect of qualified immunity resulted in many meritless claims proceeding to trial because an official's subjective good faith or malicious intent had been considered a question of fact for the jury to resolve. For that

reason, the Court in *Harlow* required a showing that the allegedly offending conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

In the wake of *Harlow,* there arose differences among the circuits whether *Harlow* had eliminated the subjective element of qualified immunity. In two decisions shortly following Harlow, the Fourth Circuit held that:

> although the *Harlow* Court indicated that the good-faith defense turns primarily on objective factors ... it did not hold that an exclusively objective standard was to be applied to claims that proceed to trial. Thus, the County's argument that the standard for good faith immunity must be purely objective is untenable.

*McElveen v. County of Prince William,* 725 F.2d 954, 957–58 (4th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 88, 83 L.Ed.2d 35 (1984); *see also Vizbaras v. Prieber,* 761 F.2d 1013, 1016 (4th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986) (citing above language of *McElveen*).

Any uncertainty about the extent to which *Harlow* requires that qualified immunity turn on objective factors has been largely resolved by recent decisions of the Supreme Court and the Fourth Circuit. The Supreme Court's decision in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) also seems to vitiate *McElveen* and *Vizbaras* to the extent they suggest that the officers' subjective intent or malice may be relevant. In *Anderson,* the Supreme Court held that consideration of the *information possessed by the government official* whose conduct was challenged "does not reintroduce into qualified immunity analysis the inquiry into officials' *subjective intent* that *Harlow* sought to minimize." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039 (emphasis added). The decision in *Anderson* continues to make clear that the relevant question "is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.

Anderson's subjective beliefs about the search are irrelevant." *Id.*

The Fourth Circuit's decision in *Rowland v. Perry,* 41 F.3d 167 (4th Cir.1994) takes the same position on objective reasonableness. The Fourth Circuit held that "the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are." *Id.,* 41 F.3d at 173.

Although *Anderson* and *Rowland* permit consideration of the facts as perceived by the officer, they preclude consideration of what *McElveen* and *Vizbaras* seem to allow, an inquiry into the official's subjective belief as to the legality of his actions. *Vizbaras,* 761 F.2d at 1015–16. For the foregoing reasons, the defendants are entitled to qualified immunity from the claims that they violated the rights of Scott and Amato under the Fourth Amendment's unreasonable search clause.[12]

## II

### The Search And Seizure State Claims

Scott and Amato challenged the same search as violative of Va.Code § 19.2–59 which provides that "[n]o officer of the law or any other person shall search any place, thing, or person, except by virtue of and under a warrant issued by a proper officer." Va.Code § 19.2–59. The Virginia statute consistently has been held to provide the same protection as the Fourth Amendment of the Constitution of the United States. *Carter v. Commonwealth,* 209 Va. 317, 163 S.E.2d 589 (1968), *cert. denied,* 394 U.S. 991, 89 S.Ct. 1479, 22 L.Ed.2d 766 (1969); *Burnham v. West,* 681 F.Supp. 1169 (E.D.Va. 1988).

The immunity defense applicable to this Virginia statute is denominated "sovereign immunity" rather than qualified immunity. Sovereign immunity protects government officials from personal liability for "acts of simple negligence." *Burnham,* 681 F.Supp. at 1173. However, because Va.Code § 19.2–

59 provides only the same protection as the Fourth Amendment, "[o]nly the constitutional standard of conduct, therefore, should apply for purposes of determining sovereign immunity in actions brought under Section 19.2–59." *Id.*

The facts alleged to give rise to this state claim are exactly the same as those discussed with respect to Fourth Amendment search claims. The court already has concluded that the defendants' conduct neither violated the Fourth Amendment nor exceed the boundaries of qualified immunity. Hence, Miller, Gooch, Hosick and Mangano are entitled to summary judgment on the state law claims under Va.Code § 19.2–59.

## III

### Amato's Unlawful Arrest Claim

The thrust of Count II of Amato's complaint, as originally cast, was an alleged violation of due process under the Fourteenth Amendment for the maliciously motivated arrest of Amato on charges of trespass and extortion. However, both parties agree that, under *Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Fourteenth Amendment's protection of substantive due process does not afford a remedy for prosecution without probable cause. *See Wilkes v. Young,* 28 F.3d 1362, 1364, n. 2 (4th Cir.1994) (following *Albright's* holding that an individual alleging prosecution without probable cause has no Fourteenth Amendment claim). In response to *Albright,* Amato has abandoned his argument that the institution of charges against him violated the Fourteenth Amendment. (Plaintiffs' Joint Mem., p. 49). Instead, by virtue of general allegations incorporated by reference in Count II, Amato claims that his Fourth Amendment rights to freedom from unreasonable seizure were violated by his surrender to arrest on charges of trespass and extortion. *See Wilkes,* 28 F.3d at 1364, n. 2 (stating that claim for arrest without proba-

---

**12.** The claims against Miller and Gooch are predicated upon their own conduct and their conduct as supervisors of Hosick and Mangano. There is no evidence to support the notion that Miller and Hosick were liable by virtue of what they did, or did not, do. Thus, where, as here the record discloses no basis to hold Miller and Gooch liable for their own actions, summary judgment in favor of Hosick and Mangano inures to the benefit of Miller and Gooch as well.

ble cause can only be judged under Fourth Amendment).

As a threshold matter, the defendants argue that summary judgment is appropriate on Count II because due process is the only constitutional deprivation asserted by Amato. The defendants advance the related argument that assertions of a Fourth Amendment claim now would require amendment of the complaint which should not be permitted at this point in the proceedings because it would work hardship on defendants. (Defendants' Reply Mem., p. 23). The argument misapprehends the content of Amato's complaint. Count II expressly incorporates by reference paragraphs one through fifty-seven of the Second Amended Complaint. In paragraph 12, Amato asserts that defendants have deprived him of his constitutional rights under the *Fourth,* Fifth, and Fourteenth Amendments, and that these deprivations have included his right to protection from unreasonable searches and seizures and *unlawful arrest.* The text of the Second Amended Complaint is sufficient to advance a Fourth Amendment claim for unlawful arrest, notwithstanding that the emphasis of Count II was originally a Fourteenth Amendment claim founded on language suggesting malicious prosecution. Further, discovery has encompassed the arrest issues. Hence, there is no hardship on defendants in defending such a claim and they certainly have not demonstrated prejudice.

In *Albright,* the Supreme Court observed that: "[t]he Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it." *Albright,* —— U.S. at ——, 114 S.Ct. at 813. The Court also explained that "[w]e have in the past noted the Fourth Amendment's relevance to the deprivations of liberty that go hand in hand with criminal prosecutions." *Id.* The Fourth Circuit has recognized that wrongful arrest can form the basis for an action under 42 U.S.C. § 1983. *Goodwin v. Metts,* 885 F.2d 157, 160 (4th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990).

■ The claim in Count II hinges on whether Amato was seized in violation of the Fourth Amendment when, on August 6, 1992, he voluntarily surrendered to arrest pursuant to the trespass and extortion warrants. Submission to arrest certainly constitutes a seizure for purposes of the Fourth Amendment. *See Albright,* —— U.S. at ——, 114 S.Ct. at 812; *Id.* at ——, 114 S.Ct. at 814 (Ginsburg concur.) ("Albright's submission to arrest unquestionably constituted a seizure for purposes of the Fourth Amendment").

Amato submitted to arrest on both the trespass and extortion charges. The issues presented by Count II are whether this seizure was unreasonable under the Fourth Amendment, *See DeLoach v. Bevers,* 922 F.2d 618, 621–22 (10th Cir.1990), *cert. denied,* 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991); *United States v. McEachern,* 675 F.2d 618 (4th Cir.1982), and whether the challenged conduct was protected by qualified immunity. *See Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986); *Torchinsky v. Siwinski,* 942 F.2d 257, 261 (4th Cir.1991).

■ Amato's unlawful seizure claim then falls within the rubric of law controlling arrest by warrant. Generally, when a police officer obtains a warrant in good faith and acts within its scope, he is not liable if the arrest is not founded on probable cause. *Olson v. Tyler,* 771 F.2d 277, 281 (7th Cir.1985). This is because the magistrate's decision operates as a shield to liability for unlawful arrest. We are here concerned with an exception to this general rule and the barrier to liability which it provides. The exception was explained by the Seventh Circuit in *Olson v. Tyler:*

If an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth [citations omitted] and no accurate information sufficient to constitute probable cause attended the false statements, not only is his conduct the active cause of the illegal arrest, but he cannot be said to have acted in an objectively reasonable manner.

*Olson v. Tyler,* 771 F.2d at 281. The same result obtains if the officer intentionally withheld information that would reveal a lack of probable cause. *DeLoach v. Bevers,* 922

F.2d at 622; Isidore Silver, *Police Civil Liability* § 4.02 (one who knowingly discloses false, incomplete, or misleading information may be liable unless the arrest was not based on that data). Of course, the untruthful statement or omission must be necessary to a finding of probable cause because otherwise there is no causal nexus to the unlawful arrest. *Wilkes v. Young,* 28 F.3d 1362, 1365 (4th Cir.1994).

To succeed on a section 1983 claim, Amato must prove not only that false or misleading statements were made or that there was a material omission, but also that there was a causal nexus between the statements or omission and a constitutional violation. This causal nexus can exist even where a magistrate issues a warrant or prosecutor makes the ultimate decision to charge or to proceed to trial, or where a grand jury decides to indict, if the defendant police officer "deliberately supplied misleading information that influenced the decision." *Goodwin v. Metts,* 885 F.2d 157, 162 (4th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990) (citing *Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir.1988)).

Amato weaves a complicated and expansive web of facts in order to support each claim. Therefore, the facts pertinent to each wrongful arrest argument will be addressed separately. These facts are relevant, however, only to the extent that the challenged conduct was necessary to the findings of probable cause on which Amato was arrested.

## A. Amato's Arrest On The Trespass Charge

Miller, Gooch and Hosick are charged in Count II with wrongfully and maliciously procuring Amato's arrest on a trespass charge arising out of the Forced Entry Incident on March 22, 1992 by Amato and Scott's lawyer, Benson. Taken in the light most favorable to Amato, the record establishes the following respecting the incident and the warrant for his arrest.

As explained previously, Scott had an interest in the premises leased to Acola and operated as Acola's Restaurant. Scott, acting through Benson, had instituted proceedings in state court to evict Acola from the restaurant and to collect delinquent rent. The state court, however, had continued proceedings until May 1992, thereby creating the possibility that Acola could retain possession under lease by bringing the rent current. Scott became concerned about property destruction at the leased premises and, at Scott's request, Benson and Amato visited the premises on March 22, 1992 with Richmond Police Officer Timothy Arthur, who had been dispatched to the premises at Benson's request.[13]

Hosick's investigation notes, recorded contemporaneously with his investigation, reflect the history of the investigation. They show that Amato reported to Officer Arthur Scott's concern that Acola was removing fixtures from the restaurant. Benson and Amato presented Arthur with a copy of a lease and certain other papers related to Acola's business. Those documents and the conversations with Amato and Benson led Arthur to the impression that Amato and Scott were in the process of obtaining an eviction notice but had not yet secured one. That, of course, was correct because the eviction proceedings were pending in state court.

At the time of the Forced Entry Incident, Amato observed a light on the upper floor of the premises and commented that he thought Acola was upstairs. According to Officer Arthur, Amato tried to open the door with the key and concluded that the locks had been changed. Amato is reported then to have said "I'll just break the door in. I'll bet he's up there." Thereupon, Amato, against the advice of Officer Arthur, broke the door in, ran upstairs and reported that no one was present. Using wood found on the premises, Amato secured the broken door and all three men left.

On March 31, 1992, Gooch, acting at Miller's direction, directed Hosick to assume control over the investigation. In the ensuing days, Hosick conducted the investigation which uncovered the facts outlined above

---

**13.** As mentioned previously, Amato was at the time using the alias of Dan Salerno and some of the reports respecting the incident use that name rather than Amato.

during interviews with Officer Arthur and Benson.

On April 2, 1992, Hosick interviewed Acola's lawyer who reported that someone by the name of "Salerno," who lived with Scott, and who, during a court hearing, claimed to have been speaking for Scott, had acted aggressively and forcefully toward Acola. The lawyer also reported that Salerno had made threats to the effect that "he was going to get my client" and then recounted the January Lock Changing Incident. Acola's lawyer informed Hosick that "Salerno was trying to force his client out of the business because he heard that there may be a sale pending of the property."

Later the same day, Hosick interviewed Acola who reported that the eviction hearings had been delayed until May because he was making progress payments; explained the January Lock Changing Incident; and stated that matters had gotten out of hand when Salerno began "intimidating him out of business."

On April 6, 1992, Hosick learned from Arthur that Magistrate Thomas and Arthur had advised Acola and Acola's attorney that the Forced Entry Incident on of March 22 was considered by them to be a civil matter and therefore that "no warrant was going to be obtained due to the lack of probable cause." The incident report prepared by Hosick on April 7, 1992, reflects the following notation:

> Because of the facts revealed in this investigation, I recommend the report be carried as "UNFOUNDED."

Having completed his investigation Hosick sought audience with Joseph Morrissey, the Commonwealth's Attorney for the City of Richmond who, on April 7, 1992, according to Hosick's report ". . . was *not* impressed that the offense occurred in the presence of a police officer. He stated that he would not prosecute the case as there is no probable cause to believe that Salerno [Amato] had intent to commit a felony in the presence of the police. He advised against obtaining any warrant for this case."

On April 9, 1992, Hosick advised Scott, Benson and Acola of the results of the investigation, including the lack of interest on the part of the Commonwealth's Attorney in prosecuting Amato. According to Hosick's notes, Acola telephoned Hosick *later in the* day and reported having spoken with the Commonwealth's Attorney who, according to Acola, had informed Acola that if Hosick wanted a warrant, Morrissey would give it to him.

Rightfully concerned about the discrepancy between Acola's report and his own previous discussion with the Commonwealth's Attorney, Hosick communicated with Morrissey on April 10, 1992. Morrissey advised that he had informed Acola that the police determined who was to be arrested and that the Commonwealth's Attorney merely handled prosecutions. Hosick's notes reflect that Morrissey said: ". . . he [Morrissey] still feels there's no probable cause to obtain a burglary warrant including the lesser offense of trespass." Confronted with Morrissey's Attorney's irresponsible equivocation in advising Hosick that there was no probable cause while, at the same time, informing the complaining citizen, Acola, that the matter was in police hands, Hosick sought out the City's Chief Magistrate, William Shannon. According to Hosick, Chief Magistrate Shannon refused to issue a warrant for the burglary and larceny claims being advanced by Acola, but advised Hosick that he would consider "issuing a warrant for trespass to Acola for Salerno [Amato] if there was probable cause including an occasion where Acola advised Salerno [Amato] to keep away and out of his business."

Later that day, Acola telephoned Hosick who passed along to Acola the magistrate's observation that ". . . that he may obtain a trespass warrant for Salerno [Amato] if he [Acola] had told him [Amato] on a previous occasion keep away." Acola and Hosick met at police headquarters and Hosick introduced Acola to Magistrate Shannon. Hosick did not participate in the conference between Acola and Magistrate Shannon. Acola signed a complaint upon which the magistrate issued a warrant for the arrest of Daniel A. Salerno on a charge of trespass. The complaint recites the following as the basis

for the magistrate's belief that there was probable cause:

> January of 1992 Salerno was told not to come back on said premises after a similar incident occurred. He came back on March 22 and kicked in the back door taking personal possessions.

Thus, the undisputed record shows that Acola, not Hosick, procured the trespass warrant. It also appears to be undisputed that on a previous occasion, Acola had attempted unsuccessfully to obtain a warrant.

Further, the record reflects that on October 11, 1994, in connection with this litigation, another Magistrate, A. Christine Browning, by affidavit reported remembering an incident which occurred "approximately two and a half years ago" in which she recalls that Hosick requested her to issue an arrest warrant on a charge of trespass against Amato. Magistrate Browning is unable to recall the exact date of the conversation and her affidavit appears to be largely the product of recollection refreshed as a consequence of newspaper articles about this litigation in 1994. Magistrate Browning reports that another Magistrate witnessed the discussion, but the record contains no information from the witness. Hosick has no recollection of the conversation except that he had some general discussion with Browning about the matter.

On the basis of these facts Amato predicates his claim of unreasonable seizure, which he articulates as follows:

> He [Hosick] himself knew that there was no probable cause for the warrant. However, he 'magistrate shopped' the case until he found one that would issue a warrant. He deliberately withheld key information to the Magistrate, leading the Magistrate to tell him that a warrant would issue if Acola would say that he had previously told Amato to stay away. He told Acola this information and then brought Acola before the Magistrate, knowing that it was the first time Acola mentioned that he had told Amato to stay away.

(Response Mem., p. 50).

Taking, as true, all of the facts on which Amato relies and giving Amato the benefit of all positive inferences, the court concludes that Hosick is not liable for the seizure of Amato in violation of the Fourth Amendment. Where, as here, the arrest is pursuant to a warrant, there is no Fourth Amendment claim unless the officer provided to the person or body charged with determining probable cause information that he knew to be false or would have known to be false had he not recklessly disregarded the truth of the statement. *Olson v. Tyler,* 771 F.2d 277, 281 (7th Cir.1985), or that he omitted information so probative as to initiate probable cause. *DeLoach v. Bevers,* 922 F.2d 618, 622 (10th Cir.1990), *cert. denied,* 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991). There is no evidence whatsoever that Hosick supplied false information to Magistrate Shannon. Conceding this, as he must, Amato argues that Hosick omitted material information by failing to inform Magistrate Shannon that the lease held by Acola permitted the landlord to enter or that, in the original interview, Acola had not reported having directed Amato not to return to the property. The information omitted is not necessary to a probable cause determination, nor is it so probative that it would initiate probable cause if disclosed. The lease issue was a pending state court dispute which neither Hosick nor the magistrate was at liberty to resolve in assessing probable cause to trespass and hence it was a neutral factor. The very nature of Magistrate Shannon's statement that he would consider issuing a warrant *if* Acola had previously ordered Amato to stay away demonstrates that the magistrate knew that Acola had not clearly made such an assertion on previous interviews. Otherwise, there would have been no need for the magistrate to have raised the subject.

Amato correctly observes that Hosick is responsible for the natural consequences of his actions and that a police officer cannot hide behind the decisions, or the conduct, of others if he has "deliberately supplied misleading information that influenced the decision." *Goodwin v. Metts,* 885 F.2d 157, 162 (4th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990) (citing *Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir.1988)); *see also DeLoach,* 922 F.2d

at 621–22 (10th Cir.1990). However, the evidence in this record does not constitute the deliberate supplying of misleading information. At most, Hosick neglected to provide information which might or might not have affected the decision to issue the warrant during an informal conversation with a magistrate who declined to issue the warrant Hosick had requested.

Indeed, it was Acola's conduct, not Hosick's, which produced the trespass charge. There is no evidence that Acola was acting at Hosick's behest. Acola tried unsuccessfully to secure a warrant without any involvement from Hosick. Acola continued to press the matter with the Commonwealth's Attorney and with Hosick. The prime actor here was Acola. That is not changed merely because Hosick reported to Acola the magistrate's observation about what would prompt him to issue a warrant for trespass. Hosick's role and conduct concerning the issuance of the warrant is insufficient to create liability in this case.

A citizen has the right to swear out a warrant, which is what Acola chose to do in this case. The magistrate found that the information provided supported a finding of probable cause for the misdemeanor of trespass. The information presented by Acola to Magistrate Shannon is sufficient to provide probable cause for a trespass warrant. The information possessed by Hosick would not have altered that determination. Because nothing that Hosick did, or did not do, was necessary to this conclusion, liability does not exist under section 1983.

## B. Qualified Immunity Concerning Trespass Charge

Even if the facts could be construed to present a triable issue respecting liability for the trespass warrant, summary judgment would still be appropriate as to all officers individually, under the qualified immunity doctrine. The court must grant summary judgment if, in light of clearly established principles of law, the officer could, as a matter of law, reasonably have believed that his conduct was lawful. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The Supreme Court has

specifically addressed the application of qualified immunity to wrongful arrest cases. In *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Court held:

[T]he same standard of objective reasonableness that we applied in the context of a suppression hearing in [*United States v.*] *Leon, supra,* [468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677] [1984] defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest. Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will the shield of immunity be lost.

*Id.* at 344–45, 106 S.Ct. at 1098. Further explaining the application of the objective reasonableness standard to cases involving arrests, the Court held "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341, 106 S.Ct. at 1096. The Fourth Circuit has followed *Malley's* formulation and application of the qualified immunity doctrine. *Torchinsky v. Siwinski,* 942 F.2d 257 (4th Cir.1991). An officer's subjective motives and beliefs play no role in this assessment. *Rowland v. Perry,* 41 F.3d 167, 172 (4th Cir.1994).

██ Based on the evidence, the court concludes that officers of reasonable competence possessing the information reasonably available to Hosick could have concluded that there was probable cause for a trespass warrant. Because Amato, acting against the advice of a police officer, broke down a door to the building at night, following an earlier confrontation with Acola in which the police had been involved, and at a time that the disputed status of Acola's lease was pending legal resolution, a reasonable officer could have concluded that probable cause existed for a trespass warrant if, as Acola told the magistrate, he had told Amato in January of 1992 to stay off the premises. The fact that Hosick had recommended that Hosick's complaint be carried as "unfounded" does not mean that, looking at the facts from his perspective at the time, it clearly violated

Amato's rights to discuss the matter with the Chief Magistrate or to inform Acola of the Chief Magistrate's position.

Qualified immunity is also appropriate because it is not clearly established how the law would apply to Hosick's conduct. He spoke with the Chief Magistrate after another magistrate had denied Acola a warrant. He provided some facts but not every fact that Amato now argues is relevant. When the Chief Magistrate indicated that he would consider issuing a warrant, Hosick did not request that one be issued. Rather, he accurately reported Chief Magistrate Shannon's position to Acola. When Acola decided to swear out a warrant, Hosick introduced him to the Chief Magistrate. The law is not at all clear that this course of conduct, by an officer mindful of accusations of favoritism by the police force, violates constitutional law. Hosick's decisions in this grey area are protected by the qualified immunity doctrine.

Amato has cited no authority explaining what clearly established law this conduct violated. In fact, his argument seems to reduce itself to the theory that Hosick continued to press the matter because of ulterior motives.

The qualified immunity analysis intentionally focuses on the objective reasonableness of Hosick's actions. Because immunity does not turn on the subjective intent of Hosick or any other defendant, the myriad of allegations about a grand scheme to "get" Amato is irrelevant. Nor is evidence of some ulterior motive for arresting Amato relevant to the determination of qualified immunity. Because Hosick's challenged conduct was objectively reasonable, he and anyone else liable for his conduct would be protected by qualified immunity.[14]

## C. Amato's Arrest On Extortion Charges

Amato makes the same Fourth Amendment wrongful arrest argument as to his arrest on the extortion indictment that he made as to the trespass. The law governing this claim is the same as the law governing the trespass claim. Because the facts and officials involved are different, it is necessary

briefly to present the facts pertinent to this claim.

On April 22, 1992, at approximately 3:15 a.m., Acola's Restaurant was destroyed by fire set by an arsonist. Investigation of the fire was assigned to Shuman as the officer on duty when the fire occurred. In the course of investigating the fire and its possible causes, Shuman became aware of the dispute between Acola and Amato. Based upon this information, Shuman communicated to William J. Parcell, Assistant Commonwealth's Attorney, his belief that Amato had threatened Acola. Parcell decided to present extortion charges against Parcell to a grand jury which indicted Amato on July 1, 1992, based principally on testimony given by Shuman. Amato surrendered on this charge and the trespass warrant on August 6, 1992.

Amato argues that his arrest "resulted from the actions of Det. Shuman on the extortion charge." Response Mem., p. 51. Amato alleges that "Det. Shuman deliberately lied to both the prosecutor and the grand jury and withheld relevant information." *Id.* This claim is based upon three alleged omissions and one alleged lie. *Id.* at 30.

The three facts allegedly omitted were that: (1) five months had passed between the Lock Changing Incident and the time that Acola first said that he was threatened by Amato; (2) the alleged threat involved a beating with a five pound salami (so as to avoid leaving marks on the body of the victim); and (3) Acola told Overstreet at the time of the Lock Changing Incident that he was satisfied, or had not been threatened. *Id.* at 30, n. 142. The alleged lie was Shuman's representation that Bilter had reported seeing "fear" in Acola's eyes during the lock-changing incident. *Id.* at 30.

 The evidence presented by Amato is insufficient to support a finding of liability based upon Amato's surrender on extortion charges. As to the three omissions, Amato presents nothing beyond conjecture that they were the result even of negligence on Shuman's part, let alone knowing or reckless

---

14. This, of course, would include Miller and Gooch whom Amato seeks to hold liable for Hosick's conduct. There is no evidence that

Miller and Gooch were involved in this episode other than receiving reports from Hosick.

disregard for the truth. The allegedly omitted information would not have precluded a finding of probable cause in the first instance. Nor does omission of that information permit a finding that Shuman knowingly or recklessly misled the grand jury. Amato would have the factfinder infer the required intent through speculation, based upon allegations and insinuations that Shuman and others were out to "get Scott and Amato" and that they had some alternative, devious agenda to extract information about a supposed federal investigation.[15] However, the evidence is insufficient to prove that Shuman knowingly or recklessly acted to mislead the grand jury.

Nor does the evidence support Amato's claim that Shuman intentionally misrepresented Bilter's statement to the grand jury. To prove that Shuman lied, Amato relies on Bilter's testimony that his statement to Shuman was that Acola was angry, not that he saw fear in Acola's eyes. On a summary judgment motion, we must take as true that Bilter did not in fact claim to have seen fear in Acola's eyes. However, Amato must also prove that Shuman knowingly or recklessly disregarded the accuracy of his representation of Bilter's comment. The record does not support this essential element of liability.

The pertinent portion of the record concerns Bilter's testimony at a hearing on Acola's motion for expungement of the arrests from his record. Bilter testified there that he did not see fear in Acola's eyes, but rather that Acola was mad. Bilter Dep., p. 78. According to Bilter, he and Shuman went for a cup of coffee after the court hearing, at which time Shuman said "You told me that you seen [sic] fear in his eyes." (Bilter Dep., p. 78).

While Bilter insists that Shuman "had to understand what I said," (Bilter Dep., p. 80) Bilter's account of this conversation shows that Shuman stood by his recollection of what Bilter had said, even in a private conversation with the man who made the statement in the first place. Not only does this not support Amato's contention of a deliberate lie, it is strong evidence that Shuman remembered the comment as he represented it to the prosecutor and the Grand Jury.

The second element of official liability for a Fourth Amendment deprivation is a causal nexus between the official action and the arrest. Amato must prove that the alleged omissions and lie were "necessary to the finding of probable cause." *Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir.1994) (citing *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)). This causal connection is absent as to the omitted information. These omissions are not of such a nature that, had complete information been provided, the grand jury could not have found probable cause. It is not enough that the omitted evidence is favorable to Amato, especially given the fact that a suspect has no right to have exculpatory information presented to the grand jury. *United States v. Williams*, 504 U.S. 36, ——, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352 (1992).

The causal nexus is also lacking as to Shuman's alleged lie. Amato contends that "the critical piece of evidence suggesting that an indictment was warranted was a statement Shuman attributed to Fred Bilter— that Bilter saw 'fear' in Acola's eyes." (Plaintiffs' Joint Mem., pp. 29–30). This assertion, which is based upon the deposition testimony of Parcell, is flawed in two respects.

First, Parcell did not testify that it was the particular comment about "fear" that was significant in the decision to prosecute. Rather, it was the more general fact that Bilter was present during the incident at issue and could corroborate Acola's version of the events that took place. (Parcell Dep., pp. 92–94).

---

**15.** The record reflects that in 1994, after this action was instituted, Shuman reportedly said that he was going to "get" Amato, that Amato and Scott were "dirty," that Scott as a "no good lousy criminal," that Amato and Scott were "scumbags" and that they were working for the F.B.I. If these statements were made, they are too far removed from the incidents in question to be probative of any animus at the time of the incidents involved in this action. The record contains no evidence to support the charge that Shuman was motivated by ill-will in the period April 22 to July 1, 1992.

Second, even if Shuman's representation of Bilter's comment did affect Parcell's decision to bring the charge before the grand jury, that does not make it necessary to the finding of probable cause. The fact that Acola was claiming that he had been threatened by Amato was, in and of itself, sufficient to support a finding of probable cause. Parcell testified that Shuman's representation of Bilter's comment corroborated Acola's version of events and made the case strong enough to handle directly through a grand jury indictment rather than through an arrest warrant. (Parcell Dep., pp. 92–93). But Parcell also clearly explains that, had Bilter not witnessed the incident at all, his advice would have been to "arrest the guy on a warrant." (Parcell Dep., pp. 92–93). The evidence establishes that Shuman's representation of Bilter's statement influenced the procedure by which Amato's arrest was pursued, not that it was necessary to the finding of probable cause.[16]

On this record, there is not sufficient evidence for the jury to return a verdict against any defendant in Amato's favor on this claim. Therefore, summary judgment is appropriate.

### D. Qualified Immunity Concerning Extortion Charge

■ Even if there were a triable issue of fact as to official liability for the arrest on the extortion charge, the court would hold that the officers are protected from personal liability by qualified immunity. The defendants would lose the protection of qualified immunity if it is objectively obvious that no reasonably competent officer could have believed probable cause to exist. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Notwithstanding the allegations made against Shuman and all other defendants, the court is confident that a reasonably competent officer could have concluded that probable cause existed to charge

Amato with extortion. Both Acola and his attorney had informed the police that Amato had threatened Acola. Amato had later forced entry into Acola's restaurant. Based on this information alone, a reasonably competent officer could have believed there to be probable cause to support extortion charges against Amato.

Where the conduct of a government official is objectively reasonable, *Harlow* and its progeny generally require that qualified immunity be recognized to avoid excessive disruption of government and to permit the summary resolution of insubstantial claims. The court concludes that Amato's claim as to the extortion charge is insubstantial and should not go forward. This result is the same both on the merits and under the qualified immunity doctrine.

### IV

### Intentional Infliction of Emotional Distress

■ In Counts III and IV of their respective complaints, Scott and Amato assert state tort claims for the alleged intentional infliction of emotional distress. They are predicated on the supplemental jurisdiction conferred on this court by 28 U.S.C. § 1367. The court declines to exercise jurisdiction over those claims because all claims over which the court has federal question jurisdiction have been dismissed on summary judgment motion. 28 U.S.C. § 1367(c)(3).

### V

### The Official–Capacity Claims

■ Miller, Gooch, Hosick, Mangano and Shuman are sued personally and officially in each count asserted by Scott and Amato. When a defendant is named in his official capacity, the suit, in reality, is against the municipality. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985);

---

16. Parcell does recognize that it is the weaker cases that are handled through arrest warrants and that the purpose in so doing is to add an additional screening process. It is therefore reasonable to infer from Parcell's statement that absent Bilter's corroborations the chances of obtaining a warrant would be reduced. However, the burden is on the plaintiffs to present evidence that this decision to go to the grand jury somehow caused the wrongful seizure of Amato. It is therefore their burden to prove that probable cause would not have been found absent the alleged "lie." The plaintiffs have failed to meet this burden.

**1152**

Martin A. Schwartz and John E. Kirklin, *Section 1983 Litigation: Claims, Defenses and Fees* § 6.5 (2 ed. 1991). The municipality, of course, is not entitled to qualified immunity. Official-capacity claims require proof that enforcement of the entity's policy or practice caused the violation of federal rights. *Id.* The record here establishes no official policy or practice of the City on which to predicate official-capacity liability of any defendant named in Counts I and II of Scott's Amended Complaint or in Counts I, II and III of Amato's Second Amended Complaint. When construed in plaintiffs' favor, the record establishes, at most, the existence of concerted action on the part of either four or five people to achieve a questionable objective. Although two of the defendants, Miller and Gooch, were of high rank within the Richmond Police Department, the record does not establish them as policy makers. Accordingly, the defendants in those counts are entitled to summary judgment in their official capacity as well.

## CONCLUSION

The motions for summary judgment on Counts I and II of Scott's Amended Complaint and Counts I, II and III of Amato's Second Amended Complaint are granted and those counts shall be dismissed with prejudice. The motions for summary judgment on Count III of Scott's Amended Complaint and Count IV of Amato's Second Amended Complaint are denied and those counts shall be dismissed without prejudice.

It is so ORDERED.